No. 25-30432

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT
_____

MICHAEL MOLITOR,

*Plaintiff-Appellant,*

*v.*

CITY OF SULPHUR,

*Defendant-Appellee*

_____

On Appeal from the United States District Court
for the Western District of Louisiana, Lake Charles Division
_____

## OPENING BRIEF OF PLAINTIFF-APPELLANT MICHAEL MOLITOR
_____

---

**SUDDUTH & ASSOCIATES, LLC**
1109 Pithon Street
Lake Charles, Louisiana 70601
Tel: (337) 480-0101
Fax: (337) 419-0507
Email: james@saa.legal
Email: kourtney@saa.legal

**BY:** /s/ James E. Sudduth, III
JAMES E. SUDDUTH, III
KOURTNEY L. KECH

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**1. Plaintiff-Appellant**

MICHAEL MOLITOR

**2. Defendant-Appellee**

CITY OF SULPHUR

**3. Counsel for Plaintiff-Appellant**

James E. Sudduth, III
Kourtney L. Kech
SUDDUTH & ASSOCIATES, LLC
1109 Pithon Street
Lake Charles, Louisiana 70601

4. **Counsel for Defendant-Appellee**

Gregory W. Belfour
JONES, TETE, FONTI & BELFOUR, L.L.P.
1135 Lakeshore Drive, 6th Floor
Lake Charles, Louisiana 70601

DATED:      October 14, 2025

**SUDDUTH & ASSOCIATES, LLC**

/s/ James E. Sudduth, III
JAMES E. SUDDUTH, III

*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

While Appellant submits that the factual circumstances underpinning his claims are straightforward, this appeal involves numerous alleged legal errors surrounding the district court's interpretation and application of the anti-retaliation provisions of the First Amendment and the Americans with Disabilities Act of 1990, as amended. Further, this appeal addresses the legal question as to whether discussion of and/or engagement in a polyamorous relationship qualifies as "protected speech" under the Supreme Court's and/or this Court's precedent. To the extent this appeal implicates overarching legal concepts and principles that apply to both this case and cases to come, Appellant believes that the Court may benefit from setting oral argument in this matter.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF AUTHORITIES ............................................................................ viii

PRELIMINARY STATEMENT ............................................................................1

JURISDICTIONAL STATEMENT ......................................................................2

STATEMENT OF THE ISSUES PRESENTED....................................................2

STATEMENT OF THE CASE...............................................................................3

     I.     Molitor's Underlying Claims ....................................................................3

          A. October 2019: The City Learns of Molitor's Polyamorous
             Relationship and Retracts Discipline on Basis of "Parking Up" ..........4

          B. July 2020: Molitor Engages in Protected Activity...............................5

          C. Smith Files an EEOC Charge and Lawsuit; Molitor Provides
             Supporting Evidence ............................................................................6

          D. October 19, 2022: Wall Instructs Captains to "Patrol More" ..............7

          E. November 9, 2022: Wall Instructs Fortenberry to Investigate
             Molitor...................................................................................................8

          F. November 15, 2022: Wall Initiates an IA on Molitor; Fortenberry
             Finds Another Captain "Excessively" Parked Up.................................9

          G. November 29-30, 2022: Molitor is Subjected to an IA; Virgadamo
             And the Other Patrol Captains Receive Informal Counseling .............9

H. December 28, 2022: Molitor Receives a Notice of Disciplinary Action ...............................................................................11

I. January 2, 2023: Molitor Appeals to the Civil Service Board ............13

J. January 18, 2023: The City's Insurance Carrier Informs the City It Can Settle *Smith* Over the City's Objection ...................................13

K. January 30-January 31, 2023: The Board Hears Molitor's Appeal And Reverses the City; *Smith* Settles ...................................................13

L. "A Few Days Later": Wall, Danahay, and Rion Appeal the Board's Decision to the 14th JDC ...................................................................15

M. December 11, 2023: Molitor Files a Petition for Damages; The City Removes the Matter ...............................................................16

N. February 16, 2024: the 14th JDC Reverses the Board; Molitor Appeals ...............................................................................................16

O. June 17, 2025: The City Moves for Summary Judgment ...................17

II. The District Court Grants the City's Motion for Summary Judgment ....17

SUMMARY OF THE ARGUMENT ........................................................................19

STANDARD OF REVIEW ......................................................................................21

ARGUMENT ...........................................................................................................22

I. The District Court Incorrectly Dismissed Molitor's ADA Retaliation Claim...............................................................................22

A. The District Court Erred to the Extent it Found that Molitor Did Not Establish His *Prima Facie* Case...................................................22

1. Molitor Engaged in Protected Activity............................23

2. Molitor was Subjected to Several Materially Adverse Actions.............................................................25

3.  The District Court Erroneously Resolved Facts and
    Inferences Against Molitor to Find that Relevant
    Decisionmakers Lacked Knowledge of His Protected
    Activity ...........................................................................26

4.  A Causal Connection Exists ...........................................30

B.  The City's Proffered Rationale is Indicative of Pretext ......................33

1.  The District Court Ignored Evidence that Molitor Did
    Not "Shirk Duties ...........................................................34

2.  The District Court Ignored Evidence
    and Resolved Fact Disputes and Inferences Against
    Molitor to find that Wall's October 19, 2022 was
    Not "Vague" ...................................................................35

3.  The District Court Inappropriately Applied this
    Court's "Comparator" Standard And
    Erroneously Disregarded the City's Disparate
    Treatment of Molitor's Fellow Patrol Captains
    As Probative Retaliation Evidence .................................40

4.  Whether Molitor's "Violation" of Wall's "Patrol
    More" Directive was of "Comparable Seriousness" to
    the Other Three (3) Patrol Captains' is a Question
    of Disputed Material Fact; Resolution of the Dispute
    in Molitor's Favor Indicates that the Patrol Captains
    are Proper Comparators ..................................................42

5.  Construing Facts and Inferences in Molitor's
    Favor, Despite Three of the Patrol Captains Being
    Found to Have Parked Up "Excessively," the
    City Only Issued Formal Disciplinary Action to
    Molitor ...........................................................................44

6.  The District Court Erroneously Disregarded
    Evidence Surrounding Molitor's 2019 "Discipline" ......45

II.   The District Court Erroneously Dismissed Molitor's First Amendment
Retaliation Claim......................................................................................48

A. The District Court Erroneously Disregarded the Broad Definition
Afforded to a Matter of "Public Concern" to Find that Speech
and/or Expression Regarding Polyamorous Relationships
Does Not Qualify for First Amendment Protections .........................49

B. The District Court Erroneously Disregarded Clear Evidence that Chief
Wall Took Adverse Action Against Molitor Based on His Public
Statements In Support of And/or Engagement in a Polyamorous
Relationship..........................................................................................53

1. Construing Evidence in the Light Most Favorable
to Molitor, Wall Admitted that Molitor was
*Not* Excessively Parking Up at Crocker Street
in 2022 .....................................................................................54

2. Construing Evidence in the Light Most
Favorable to Molitor, The City's Records
Reflected Him "Parking Up" Excessively at
Victory Worship Center, *Not* Crocker
Street.........................................................................................55

3. The District Court Erroneously Disregarded
Evidence Refuting Any Contention that the City
Would Have Taken the Same Action Absent
Molitor's Protected Conduct ....................................................57

CONCLUSION ....................................................................................................59

CERTIFICATE OF SERVICE ............................................................................59

CERTIFICATE OF COMPLIANCE WITH
FED. R. APP. PRO 32 AND 5th CIR. R. 32 ........................................................60

# TABLE OF AUTHORITIES

**Case Law** **Page(s)**

*Alamo v. Bliss,*
864 F.3d 541 (7th Cir. 2017) ...................................................................31

*Brown v. Wal-Mart Stores East, L.P.,*
969 F.3d 571 (5th Cir. 2020) ...................................................................34

*Bryant v. Compass Group USA, Inc.,*
413 F.3d 471 (5th Cir. 2005) ...................................................................40

*Cook v. Gates,*
528 F.3d 42 (1st Cir. 2008) .....................................................................52

*Coughlin v. Lee*,
946 F.2d 1152 (5th Cir.1991) .............................................................21, 48

*Dixon v. Gonzales,*
481 F.3d 324 (6th Cir. 2007) ...................................................................31

*D.S. v. East Porter County School Corp.,*
799 F.3d 793 (7th Cir. 2015) ...................................................................41

*Forte v. Liquidnet Holdings, Inc.,*
675 Fed. Appx. 21 (2d Cir. 2017) ............................................................41

*Gibson v. Kilpatrick,*
838 F.3d 476 (5th Cir. 2016) ...................................................................50

*Hammond v. Jacobs Field Servs*.,
499 Fed.Appx. 377 (5th Cir. 2012) ..........................................................22

*Haverda v. Hays County,*
723 F.3d 586 (5th Cir. 2013) ...................................................................48

*Harville v. City of Houston,*
945 F.3d 870 (5th Cir. 2019) ....................................................................X

*Kirby v. City of Elizabeth City*,
388 F.3d 440 (4th Cir. 2004) ...................................................................50

*Lane v. Franks*,
—— U.S. ——, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014).........................50

*Lee v. Kan. City S. Ry. Co.*,
574 F.3d 253 (5th Cir. 2009) ..............................................................40, 42

*Lewis v. Sec'y of Pub. Safety & Corr.*,
870 F.3d 365 (5th Cir. 2017) ...................................................................21

*Lumpkin v. Aransas Cty., Tex.*,
712 Fed.Appx. 350 (5th Cir. 2017).........................................................51

*Lyons v. Katy Independent School District*,
964 F.3d 298 (5th Cir. 2020) ...................................................................22

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*,
584 U.S. 617, 138 S.Ct. 1719, 201 L.Ed.2d 35 (2018)......................50, 51

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)................................48

*Obergefell v. Hodges*,
576 U.S. 644, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015)....................50, 51

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).........................21

*Roberts v. U.S. Jaycees*,
468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)...........................51

*Sandstad v. CB Richard Ellis, Inc.*,
309 F.3d 893 (5th Cir. 2002) ...................................................................21

*Shahrashoob v. Texas A&M University*,
125 F.4th 641 (5th Cir. 2025) ..................................................................40

*Sherrod v. Am. Airlines, Inc.,*
132 F.3d 1112 (5th Cir. 1998) ..................................................22

*Turner v. Kan. City S. Ry. Co.,*
675 F.3d 887 (5th Cir. 2012) ...........................................42, 43

*Welsh v. Fort Bend Indep. Sch. Dist.,*
941 F.3d 818 (5th Cir. 2019) ...................................................26

*Williams v. Fontanez,*
2023 WL 3819296 (D. Md. June 5, 2023) ................................51

**Statutes**

28 U.S.C. § 1291 .........................................................................2

28 U.S.C. § 1331 .........................................................................2

42 U.S.C. § 12101 *et seq.* ..........................................................1

42 U.S.C. § 12203 ................................................................23, 24

Fed. R. Civ. P. 56(a) .................................................................21

**Other Sources**

Note, Three's Company, Too: The Emergence of Polyamorous Partnership
Ordinances, 135 Harv. L. Rev. 1441, 1444 (2022)...................51

Neel Burton, Polyamory: A New Way of Loving?, Psych. Today (Mar. 19, 2020),
https://www.psychologytoday.com/us/blog/hide-and-seek/201704/polyamory-new-
way-loving [https://perma.cc/25NU-W23Z] ..........................51

**PRELIMINARY STATEMENT**

Plaintiff-Appellant, Michael Molitor ("Molitor"), brings this litigation against Defendant-Appellee, the City of Sulphur ("the City"), under the anti-retaliation provisions of the First Amendment to the United States and Louisiana State Constitutions, as well as the anti-retaliation provisions of the Americans with Disabilities Act of 1990, as amended ("ADA").

Molitor submits that he was subjected to more egregious discipline than police officers who engaged in nearly identical behavior because of 1) his statements in support of and/or his engagement in a polyamorous relationship and/or 2) his involvement in ADA litigation brought by a former Sulphur PD officer. Molitor posits that that the district court erred when it granted the City's Motion for Summary Judgment on his ADA and First Amendment claims, not only because it resolved fact disputes and inferences *against* Molitor to find that the City's decisionmakers lacked the requisite knowledge and/or retaliatory motive, but it unduly, narrowly interpreted this Court's precedent regarding both "comparator employees" and "speech on a matter of public concern" to find that Molitor did not raise a material fact question as to whether the City's decision to suspend him without pay, demote him, and prohibit him from traveling to a certain residential address during work hours was in retaliation for his protected status. Construing facts and reasonable inferences in Molitor's favor, a reasonable

factfinder could determine that Molitor's protected activity was a but-for cause of the City's disparate disciplinary decision. The district court erred and must be reversed accordingly.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. § 1331. This action creates the existence of a federal question, as it arises under the First Amendment to the United States Constitution, U.S. Const. amend. I and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

The district court rendered judgment on July 30, 2025, and Molitor filed a timely notice of appeal later that afternoon. ROA.1631-32. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the district court's Judgment constitutes a final order or judgment that disposes of all parties' claims in Case No. 2:24-cv-00114. This is not an appeal from a decision of a magistrate judge.

## STATEMENT OF THE ISSUES PRESENTED

1. Whether the district court erroneously resolved facts and inferences against Molitor to find that he failed to raise a fact question as to when and whether City decisionmakers acquired knowledge of the *Smith* litigation and/or Molitor's involvement therein;

2. Whether the district court erred by narrowly construing this Court's established precedent on "comparator employees" to find that Molitor's fellow patrol captains were not "similarly situated";

3. Whether the district court impermissibly ignored or discredited record evidence, or otherwise resolved facts and inferences *against* Molitor, to find that Molitor failed to raise a material fact question as to whether the City's adverse actions against him were pretext for discrimination/retaliation; and

4. Whether the district court erred by narrowly construing the term "speech on a matter of public concern" to exclude statements made and/or conduct undertaken in furtherance of a stated support of polyamorous relationships.

## STATEMENT OF THE CASE

### I.    Molitor's Underlying Claims

Molitor began his employment with the Sulphur PD as a police officer in 2003, and he was promoted to patrol captain on July 1, 2016. ROA.1293. Former Police Chief, Lewis Coats ("Coats") described Molitor as a "phenomenal officer,"[1] and City witnesses confirm Molitor's intelligence, legal knowledge, ability to train

---

[1] ROA.1375.

other officers, and ability to "do the job." ROA.1228, 1289, 1291, 1301-02, 1375-76, 1409.

The mayor serves as the City's appointing authority and titular decisionmaker. ROA.1349, 1380. However, Mayor, Mike Danahay ("Danahay"), does not initiate any disciplinary process, but merely reviews and "signs off" on recommendations provided by the acting Police Chief, ROA.1304, 1349-50. Danahay has never overridden a Chief's proposed discipline, and Danahay's decisions are limited to his discussions with the Chief about the result of any findings. ROA.1350-51.

### A. October 2019: The City Learns of Molitor's Polyamorous Relationship and Retracts Discipline on Basis of "Parking Up"

An October 2019 Internal Affairs (IA) investigation[2] revealed that Molitor "parked up[3]" at a residence on South Crocker Street determined to be the residence of Delia, Molitor's girlfriend. ROA.1290-95, 1376-77. Though prior rumors had surfaced,[4] Coats, Human Resources Director, Connie Rion ("Rion"),[5] and the rest of the City learned that Molitor engaged in a polyamorous relationship with Delia—what Coats described as a "throuple"—as a result of the IA investigation. ROA.1294, 1355, 1389-90, 1420-21. Molitor displayed a photograph of both his

---

[2] The Chief initiates IA investigations. ROA.1415.

[3] "Sitting up," or "parking up," refers to situations where an officer's police unit appears on the GPS to be in "park" or "idle."

[4] ROA.1296.

[5] ROA.1276-77.

wife and Delia on his work desk,[6] and he took both women to a work banquet. ROA.1421. At that time, Molitor's open involvement in a polyamorous relationship became "common knowledge within the PD." ROA.1295, 1355.

The City initially wanted to demote Molitor from captain to sergeant, as well as to place him on a 14-day, unpaid suspension, as a result of the IA findings;[7] however, due to discriminatory statements made by the City's attorney during the Loudermill Hearing, the City paid Molitor for the days he missed and "moved forward" *without* issuing any discipline. ROA.1304. Molitor received a raving performance review from his supervisor, Craig Fortenberry ("Fortenberry"), for the 2019 year, ROA.1264-66, and the City had no issues with Molitor from 2019 through November 2022. ROA.1301, 1353-54.

### B. July 2020: Molitor Engages in Protected Activity

After one of Molitor's subordinate officers, Sean Smith ("Smith"), experienced COVID-19 symptoms on July 4, 2020, the City refused to return Smith to work unless he submitted to a blood/antibody test,[8] which Smith argued was an illegal examination in violation of the ADA. ROA.1429-60.[9] Molitor "r[an] interference" between Fortenberry and Smith during this disagreement.

---

[6] ROA.1295, 1355, 1390-91, 1421.
[7] ROA.1380, 1382, 1418.
[8] ROA.1392-93, 1394.
[9] A "serology" test determines whether an individual had been previously infected. This is distinct from a PCR/ antigen test, which detects whether a person has an active COVID-19 infection. ROA.1429-60.

ROA.1267-68, 1392, 1423. As confirmed by Assistant Chief, Larry Guillotte ("Guillotte"), Molitor "express[ed] his concerns to [the City] about the law and wanted to tell [the City] the law, the CDC law." ROA.1423-24.

During a recorded meeting, Molitor argued that the City's antibody test requirement ran "against the EEOC and the ADA, it's against the law." ROA.1428. It was clear to those present that Molitor supported Smith's position about the impropriety of the serology test and that Coats was frustrated by it. ROA.1268-69, 1425, 1428.[10] Danay, Rion, and Thorn, also learned of the meeting and Coats' frustration with Molitor. ROA.1338.

### C. Smith Files an EEOC Charge and Lawsuit; Molitor Provides Supporting Evidence

Smith resigned on July 23, 2020 and filed an EEOC Charge on October 16, 2020, claiming that he had been constructively discharged and otherwise discriminated against in violation of the ADA. ROA.1461-62. The City, through Rion, received notice of the Charge on October 25, 2020. ROA.1463.

Smith submitted a Rebuttal Statement on February 9, 2021 and attached Molitor's recording of his meeting with Coats, Fortenberry, and Guillotte thereto. ROA.1464.

Smith filed a subsequent lawsuit, captioned *Sean C. Smith v. The City of Sulphur*, Civil Action No. 2:22-cv-00244, on January 27, 2022. ROA.1465-76. On

---

[10] ROA.1268-69, 1425.

August 31, 2022, Smith's counsel produced Molitor's recording as "Plaintiff–Smith, Sean 234" to Smith's written discovery responses. ROA.1489-1511. At the latest, the City, through its counsel, had knowledge that Molitor had provided his recording to Smith in support of Smith's ADA claim against the City as of August 31, 2022.

### D. October 19, 2022: Wall Instructs Captains to "Patrol More"

Coats retired as Chief in June 2022, and Wall assumed the position in September 2022. ROA.1222-23, 1305, 1402. Until this time, Wall had no supervisory authority over Molitor. ROA.1228.

During a supervisor meeting on October 19, 2022, Wall verbally instructed Molitor and the three other patrol captains, "the time of sitting up is over. It's time to hit the neighborhoods and patrol more." ROA.1099, 1122. Wall's directive was not memorialized in writing: the only instruction to these supervisors was to "quit sitting up" and "patrol *more*." ROA.1108-09. There was no clarification as to exactly how much additional patrolling was encompassed in Wall's use of the word "more," nor was there any guidance providing an amount of park up/sit up time considered to be "excessive" for disciplinary purposes. That being said, the duties of a captain encompass non-patrol, administrative work, and because "the duties of a captain [ ] change on a daily basis," there is "no number" or hours per shift a

captain must patrol in order to conform his or her conduct to Chief Wall's directive. ROA.1108-09.

### E. November 9, 2022: Wall Instructs Fortenberry to Investigate Molitor

On November 9, 2022, Wall emailed Fortenberry asking him to "look into" Molitor because Wall noticed "he is spending excessive times at an address on or near Phillips Street. ROA.1258, 1512. According to Wall, the stated address "was known that's where Sergeant Molitor at one point girlfriend lived. With him being married and visiting someone while on duty in a city unit, it's just as Chief, I felt obligated to make that decision for him not to go there." ROA.1126, 1132.

Notwithstanding Walls' targeted investigatory directive, Fortenberry investigated each of the four captains, and he provided his observations and conclusions[11] regarding each to Wall. ROA.1116. According to Fortenberry, Molitor appeared to be "sitting up" at certain locations for "excessive hours;"[12] however, Fortenberry "never felt a need" to counsel Molitor because he, along with the other three captains, had been "informed what they needed to be doing" during the October 19, 2022 meeting. ROA.1116. Fortenberry was not present for the October 19, 2022 meeting, however, and so he cannot confirm what Wall relayed. ROA.1116.

---

[11] Fortenberry testified that he investigated all of the captains at the same time. ROA.1116-17.
[12] ROA.1115-16.

Notably, Fortenberry's investigation revealed that Molitor's time spent on Phillips/Crocker street was minimal compared to the time he spent at Victory Worship Center. ROA.1120-21.

### F. November 15, 2022: Wall Initiates an IA on Molitor; Fortenberry Finds Another Captain "Excessively" Parked UP

On November 15, 2022, Wall contacted Major Jason Gully ("Gully") and initiated an IA investigation into Molitor because, based on Wall's "research," Molitor "was spending an excessive amount of time at certain locations." ROA.1101, 1513. On November 19, 2022, Gully informed Molitor that Molitor was being subjected to an IA investigation relating to patrol activity between and including the dates of October 1, 2022 and November 13, 2022.

Fortenberry reviewed the GPS logs of another patrol captain, Virgadamo, on the same day that Wall sent Molitor to IA and found that Virgadamo, like Molitor, had what Fortenberry himself characterized as "very excessive" idling times. Fortenberry noted "Captain B at times regularly parks his unit up to an hour to several hours at a time while on duty. This is well above the amount of time it would take to perform supervisor duties." ROA.1270, 1517.

### G. November 29-39, 2022: Molitor is Subjected to an IA; Virgadamo And the Other Patrol Captains Receive Informal Counseling

On November 29, 2022, Molitor received an Investigative Directive, indicating that he was being investigated "for possible violation of Department

Policy and Procedures # 107 – Shirking Duties and Obeying Orders." That same day, Wall issued Virgadamo an informal Supervisor/Subordinate Conference Sheet based upon Fortenberry's finding that Virgadamo had "very excessive" sitting up (idling) times on patrol. ROA.1260, 1308, 1517.

On November 30, 2022, Fortenberry reviewed the GPS logs of the two remaining patrol captains, Jordan and Welch. ROA.1516, 1518. Fortenberry determined that Welch, like Molitor and Virgadamo, had "very excessive" park up times, and Wall issued Welch a Supervisor/Subordinate Conference Sheet on December 1, 2022. ROA.1518. Upon Fortenberry's finding that Jordan had "been parked up to an hour to a few hours at a time" but that his "patrol is not hitting the neighborhoods and are just staying on the main roads," Wall issued Jordan a Supervisor/Subordinate Conference Sheet on December 2, 2022. ROA.1516.

In connection with each Conference sheet, Fortenberry instructed Jordan, Virgadamo, and Welch, "don't spend more than 2 or 3 hours in one spot." ROA.1260. This was the first time Fortenberry provided any clarification to Wall's previous request to "patrol more." ROA.1259. Fortenberry did *not* have a conversation with Molitor regarding Wall's October 2019 directive at any time following October 19 meeting, however. ROA.1258.

Despite the fact that  Fortenberry found two other captains to have "parked up" "excessively," i.e., "well above the amount of time it would take to perform

supervisor duties," Jordan, Virgadamo, and Welch each received nothing more than an informal counseling sheet that: 1) did not go into their personnel file and 2) would be destroyed after a year. ROA.1079.[13] The City's discipline of Molitor, however, was far more punitive.

### H. December 28, 2022: Molitor Receives a Notice of Disciplinary Action

Molitor participated in an IA interview with Gully and Fortenberry on December 6, 2022. ROA.1100. On December 14, 2022, Molitor received a Notice of Pre-Disciplinary (Loudermill) Hearing, which charged him with violating Department Policy and Procedures # 107 – Shirking Duties and Obeying Orders and which, according to and notified him that the violation "may result in disciplinary action for the reason(s) identified . . . from . . . La. R.S. 2500." ROA.1544-47. The Notice commanded Molitor to appear the following day, December 15, 2022, for a pre-disciplinary (Loudermill) hearing. ROA.1544-47.

On December 28, 2022, Wall issued Molitor a Notice of Disciplinary Action, signed by both Wall and Danahay, imposing the following discipline, effective January 1, 2023: 1) 14-day suspension (12-hour day); 2) demotion to the rank of Police Sergeant; 3) EAP counseling (for Burn Out); and 4) prohibition against

---

[13] Counseling sheets presented to the Board remain in the employee's file for one year; however, some counseling sheets are issued without implicating the civil service process. ROA.1285.

Molitor going to 512 S Crocker Street ("Crocker Street") on Duty and/or in Police Unit. ROA.1548-52.

Wall presented the proposed Personnel Action Form (PAF) recommending this discipline to Danahay for Danahay's approval and signature. ROA.1354. Danahay questioned Wall about his inclusion of the Crocker Street prohibition, and Wall asserted that Crocker Street was where most of Molitor's sitting up occurred. ROA.1355. Danahay relied on Wall's assertion and did not review any GPS documentation to confirm whether Molitor had actually been parked up at the Crocker Street. ROA.1355-56. Danahay agreed to the ban only "if that's where the sitting up was taking place." ROA.1356.

Wall's assertion to Danahay that Molitor was excessively parking up at Crocker Street is false. Wall testified that "in 2019 Molitor was doing the same thing *at a different location* that what he was doing in 2022." ROA.1230, 1235. Fortenberry's investigation confirmed that Molitor's time spent on Phillips/Crocker street was minimal compared to the time he spent at Victory Worship Center in 2022. ROA.1120-21. Wall further admitted that his decision to include the South Crocker Street prohibition—and, imperatively, to not include a prohibition on the Victory Worship Center—was simply because "that address was part of a prior investigation and discipline." ROA.1239. Guillotte, who was in the room when

Wall included the Crocker Street prohibition in the PAF, indicated his disagreement with including that provision: "that was all chief that put that in there." ROA.1419.

### I.   January 2, 2023: Molitor Appeals to the Civil Service Board

Molitor timely appealed the disciplinary action to the Civil Service Board ("Board") on January 2, 2023. ROA.81. Molitor moved to dismiss the charges because he had not been found in violation of La. R.S. § 33:2500; however, the Board permitted the City to file an amended PAF. ROA.81, 102-03.

### J.   January 18, 2023: The City's Insurance Carrier Informs the City It Can Settle *Smith* Over the City's Objection

On January 18, 2023, Danahay, Thorn, Wall, and Rion received an email indicating that the City's Excess Carrier had contractual authority to settle *Smith* without City approval. ROA.1338-39, 1553. The insurance company then expressed a desire make a settlement offer before Smith's deposition, which was set for January 30 [sic], 2023. ROA.1553.

The City took Smith's deposition on January 30, 2023. City counsel provided his impressions to Danahay and Rion, among others, shortly thereafter. ROA.1554-57.

### K.   January 30-January 31, 2023: The Board Hears Molitor's Appeal and Reverses the City

The Board conducted a nine-and-a-half-hour evidentiary hearing on Molitor's appeal beginning the evening of January 30 2023. ROA.1063-1149. The

Board *unanimously*[14] voted to 1) reverse the City's decision to suspend and demote Molitor; 2) reverse the prohibition that Molitor travel to 512 Crocker Street during work hours; and 3) to uphold the mandate for Molitor to attend EAP counseling. ROA.1148-49. The Board overturned the Crocker Street prohibition due to "the Anti-Discrimination Act." ROA.1148. The Board then concluded the hearing by emphasizing that its decision to overturn Molitor's discipline was the principle, "if you do for one, you need to do for all," and that, because all of the patrol captains "had infractions," it would "only be fair for everyone to have the same disciplinary action." ROA.1148-49. The Counseling Sheets presented to the Board reflected Fortenberry's unqualified "finding" that three of the four captains had "excessively" parked up, and the Board overturned Molitor's discipline as unduly severe as compared to the other patrol captains found to have violated Wall's October 19, 2022 directive.

Rion informed Danahay of Board's decision the following morning. ROA.1357. Smith's counsel tendered a settlement offer that afternoon, which counsel forwarded to Danahay, Rion, and the insurance company representatives. ROA.1554-57. The parties reached settlement-in-principle, subject to City Council approval, on January 31, 2023. ROA.1341.

---

[14] ROA.1149.

The City was "strongly against" settling Smith;[15] however, the insurance company settled the matter over the City's objection. ROA.1321-22. At the agreed-upon settlement value, the City would be responsible for the entirety of the payment, as it is self-insured to a specified monetary amount. ROA.1336, 1343. Thorn also confirmed that the City's insurance premiums increased as a result of Smith's lawsuit and settlement. ROA.1337.

## L. "A Few Days Later": Wall, Danahay, and Rion Appeal the Board's Decision to the 14th JDC

Rion informed Danahay's of the Board's decision the following morning, January 31, 2023. ROA.1357. Danahay met with Wall and Rion "a few days later" to discuss whether to appeal the Board's decision, though the City could not confirm the time and date of the meeting. ROA.1357-59.

On February 13, 2023, the Council adopted the recommendation to settle *Smith*. ROA.1482. On February 27, 2023, the City filed a Petition for Judicial Review with the 14th Judicial District Court, Parish of Calcasieu ("14th JDC), requesting judicial reversal of the Board's decision and full reinstatement of Molitor's suspension, demotion, and Crocker Street prohibition.

In Danahay's seven years as Mayor, Molitor was the only officer whose Board decision the City appealed. ROA.1360. Thorn likewise confirmed that

---

[15] ROA.1322, 1336.

Molitor was the only time in her nine years as Financial Director that the City appealed the Board's decision in a disciplinary action. ROA.1344.

### M. December 11, 2023: Molitor Files a Petition for Damages; the City Removes the Matter

While the City's 14th JDC appeal remained pending, Molitor filed a Petition for Damages on December 11, 2023 to preserve his First Amendment Retaliation claims. At the time, Molitor had filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 261-2023-01582. The City removed the matter on January 29, 2024, asserting subject matter jurisdiction. ROA.7-8. Upon receipt of a Dismissal and Notice of Rights on April 9, 2024,[16] Molitor amended his suit to include the now-exhausted claims arising under the ADA. ROA.77-88.

### N. February 16, 2024: The 14th JDC Overrules the Civil Service Board; Molitor Appeals

Following a hearing on February 16, 2024, the 14th JDC issued a written ruling reversing the decision of the Board. The 14th JDC thereafter signed a judgment on March 4, 2024, in favor of the City and Wall against Molitor, reversing the decision of the Board and reinstating Molitor's suspension without pay, demotion, and Crocker Street prohibition. Molitor e-filed an Application for Supervisory Writs to the Third Circuit Court of Appeals on April 3, 2024. On April

---

[16] ROA.72.

25, 2024, the Third Circuit denied Molitor's writ application, stating that it was declining to exercise its supervisory jurisdiction. Molitor timely filed a Petition for Writ of Certiorari to the Louisiana Supreme Court on May 28, 2024, which remains pending.

### O. June 17, 2025: The City Moves for Summary Judgment

On June 17, 2025, the City filed a "Motion for Summary Judgment, Motion to Strike Request for Jury Trial and to Strike Requests for Compensatory and Punitive Damages with Respect to Retaliation Claims." ROA.118-21. Because the district court denied the Motion(s) to Strike as moot, the only portion of the judgment on appeal is the district court's grant of the City's Motion for Summary Judgment. ROA.1629-30. The City's Motion sought dismissal of Molitor's ADA and First Amendment Retaliation claims in full. ROA.135-38, 141-45.

## II.     The District Court Grants the City's Motion for Summary Judgment

After issuing its memorandum ruling granting judgment to the City, the district court entered judgment on July 30, 2025. ROA.1612-31. First, in dismissing Molitor's ADA retaliation claim, the district court "agree[d] with [the City], that it is pure speculation as to Wall's knowledge of the *Smith* lawsuit, and [Molitor]'s participation therein." ROA.1617-21. Next, the district court—relying on a fact finding made by the 14th JDC—determined that: 1) "Wall considered that [Molitor] had already been warned and disciplined, including suspension in 2019

for excessive 'parking up'"; 2) "the other three Captains' 'parking up' times were not equivalent to [Molitor]'s times"; and 3) "it would not be proper to compare [Molitor]'s discipline with the other three Captains as they were not similarly situated." ROA.1621-22. The district court then disregarded Molitor's evidence reflecting the administrative functions of Molitor's captain position and found that "[i]t is beyond comprehension that a Captain of a patrol unit would require 5, 6, 9, or 9.5 hours to perform administrative duties." ROA.1622. In dismissing the claim, the district court found that Molitor "failed to establish a causal connection between [Molitor]'s participation in the *Smith* lawsuit" and the alleged adverse actions, and that, "even if there was a causal connection, there was not pretext." ROA.1622.

The district court next dismissed Molitor's First Amendment retaliation claims, finding first that speech regarding polyamory does not "touch on a matter of public concern." It then cited its agreement with the City's assertion that Molitor's discipline "had nothing to do with his belief in polyamory" and stating, "to be certain, this case has nothing to do with where he parked, who he was seeing, or if he had a girlfriend and a wife, but the amount of undisputed time he was parked instead of patrolling the streets of Sulphur responding to calls." ROA.1625. Finally, for the same reasons it found that Molitor had failed to adduce substantial evidence of pretext with respect to his ADA retaliation claim, the

district court found that Molitor had failed meet his summary judgment burden as to pretext as to his First Amendment retaliation claims.

## SUMMARY OF THE ARGUMENT

This Court must reverse and remand for further proceedings.

First, the district court disregarded evidence from which a reasonable factfinder could determine that the City's decisionmakers had the requisite knowledge and retaliatory motive to, not only issue Molitor the initial discipline on December 28, 2022, but to judicially appeal the Board's decision reversing the same after the *Smith* litigation settled on January 31, 2023. In so doing, the district court improperly resolved a series of reasonable inferences against Molitor to impermissibly discredit the testimony of City witnesses confirming the free flow of personnel information throughout Sulphur PD, and it ignored evidence that the decisionmakers had collective knowledge of Molitor's protected activity before deciding to appeal the Board's disciplinary decision in an attempt to more severely discipline Molitor.

Second, the district court improperly heightened this Court's "comparator" standard to find that the City's far more favorable disciplinary treatment of Molitor's fellow patrol captains, each of whom engaged in the same degree of "violation" or the same work "rule" as Molitor, was not probative evidence of discrimination/retaliation. Molitor and his fellow patrol captains are "nearly

identical" in all material aspects, and the City's decision to informally counsel the other patrol captains while, at the same time, demoting and suspending Molitor, is probative evidence from which a factfinder could derive retaliatory motive.

Third, the district court ignored substantial evidence permitting a reasonable inference that the City's continued reliance on Wall's vague, October 19, 2022 directive to "patrol more," as well as the City's suggestion that Molitor "shirked duties" under the circumstances, is pretextual. Not only does evidence construed in Molitor's favor confirm that the October 19, 2022 was far too vague to legitimately justify the severe discipline metered to Molitor, but it also confirms, under the circumstances, that the City's reliance on Policy # 107 is unworthy of credence.

Fourth, the district court ignored Supreme Court and this Court's precedent describing speech which "touches on a public concern," finding instead that Molitor's public support of polyamorous relationships, i.e., a non-traditional relationship construct, does not warrant First Amendment protection. The social and relationship construct of "polyamory" is a political and social concern to the community, is a subject of general interest and of value and concern to the public, and it warrants First Amendment protection accordingly.

Finally, the district court disregarded evidence, including Wall's testimony, which permits a reasonably inference that Wall's decision to disparately discipline Molitor is based on Wall's disagreement with Molitor's views on polyamory.

Due to the numerous, compounding legal errors committed with respect to Molitor's retaliation claims, the district court's decision must be reversed, and the matter must be remanded for further proceedings.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment *de novo*. *Lewis v. Sec'y of Pub. Safety & Corr.*, 870 F.3d 365, 368 (5th Cir. 2017). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court must consider all facts and evidence in the light most favorable to the nonmoving party, it may not make credibility determinations or weigh the evidence, *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002), and it "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

As to Molitor's First Amendment retaliation claim, whether an employee's speech/conduct addresses a matter of public concern is a question of law which this Court decides *de novo*. *Coughlin v. Lee,* 946 F.2d 1152, 1156 (5th Cir. 1991).

# ARGUMENT

## I. The District Court Erroneously Dismissed Molitor's ADA Retaliation Claim

ADA retaliation claims are evaluated using the *McDonnell Douglas* burden-shifting framework, which first requires Molitor to establish a *prima facie* case. *Hammond v. Jacobs Field Servs*., 499 Fed.Appx. 377, 382 (5th Cir. 2012)(citation omitted). The City must articulate a legitimate, nondiscriminatory reason for the adverse employment action and, if the City meets its burden, then the burden shifts back to Molitor to show that the City's proffered reason was a pretext for unlawful discrimination. *Id.*

### A. The District Court Erred to the Extent it Found That Molitor Did Not Establish His *Prima Facie* Case

To establish his *prima facie* claim, Molitor must show that: (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. *Lyons v. Katy Independent School District*, 964 F.3d 298, 304 (5th Cir. 2020). A "causal link" is shown when the evidence demonstrates that the employer's adverse employment decision "was based in part on knowledge of the employee's protected activity." *Sherrod v. Am. Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir. 1998).

The district court found that Molitor failed to "establish a causal connection between [Molitor]'s participation in the *Smith* lawsuit and Wall's investigation and

the ultimate discipline of [Molitor]." ROA.1622. While the district court agreed that Molitor's last act of participation activity was the disclosure of Molitor's name on Smith's Initial Disclosures and production of Molitor's recording to City counsel in support of Smith's case on or about August 31, 2022, the district court determined that neither Danahay nor Wall had the requisite "retaliatory animus" to support Molitor's claim. ROA.1619-20. Because this Court's review is *de novo*, Molitor addresses each prong of analysis; however, the district court erred in finding that Molitor failed to raise a material fact question as to *prima facie* causation.

### 1. Molitor Engaged in Protected Activity

The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203. Molitor presented evidence that he engaged in both ADA opposition and participation activity.

In July 2020, Molitor met with Coats, Guillotte, and Fortenberry—the Chief, Assistant Chief, and a Supervisor—contesting Sulphur PD's requirement that officers submit to an ADA-violative serology test to return to work following COVID-19 exposure. ROA.1428. To the extent Molitor opposed what he

reasonably believed to be the City's imposition of an illegal medical examination, Molitor engaged in protected activity contemplated by 42 U.S.C. § 12203(a). Numerous City officials, including Coats, Guillotte, Fortenberry, Danahay, Rion, and Thorn, knew that Molitor had engaged in this activity and that Coats had expressed frustration about it. ROA.1245, 1247, 1268-69, 1338, 1361, 1425.

At that point, while frustrating to the City, Molitor's opposition activity did not result in any tangible loss to the City. The City's unremediated action, however, resulted in Smith filing an EEOC Charge, and Molitor provided a copy of the recorded meeting, which was submitted to the EEOC on Smith's behalf during the resultant investigation. By participating or otherwise providing information in connection with Smith's Charge, Molitor engaged in protected participation activity no later than February 9, 2021, when his recording was tendered to the EEOC. ROA.1464.

Even if the City claims EEOC did not provide it with a copy of Molitor's recording, the City indisputably had knowledge of Molitor's recording, at the latest, as of August 31, 2022, when Smith's counsel produced a copy of the recording to the City in connection with Smith's written discovery responses. ROA.1494, 1502, 1506-10. The submission of the recording—this time in connection with a formal, ADA lawsuit—falls squarely within the type of activity protected by 42 U.S.C. § 12203(a). Not only that, but the same day, Smith included

Molitor's name in response to an Interrogatory requesting anticipated trial witnesses. ROA.1495.

As acknowledged by the district court, the City's assertion that "[i]t is only Plaintiff's 2020 complaint, not later progress of the Smith litigation, which can be used by Plaintiff" is incorrect. ROA.1619-20. Molitor engaged in two subsequent acts of protected participation activity, with the last act being the provision of his recording in support of Smith's ADA claims to the City's legal counsel on August 31, 2022. There is not, as the City argued, a "lapse of two (2) years between the alleged protected conducted and the adverse action." ROA.134, 161-29.

## 2. Molitor was Subjected to Materially Adverse Actions

Following Wall's decision subject Molitor to an IA investigation beginning November 15, 2022, the City demoted Molitor from captain to sergeant, suspended him without pay for fourteen days, and issued a blanket prohibition from traveling to Crocker Street during work hours on or about December 28, 2022. Then, after Molitor successfully appealed the disciplinary actions to the Board, the City, for the first time in over a decade, decided to appeal the Board to the 14th JDC in February 2023.

As to the IA investigation, Wall's intent to "search" Molitor on November 9, 2022, combined with the fact that he later issued much lesser discipline—i.e., informal counseling—to the other patrol captains who also engaged "very

excessive" parking up, renders this particular IA materially adverse. This is even moreso true, given that the IA investigation is what resulted in Wall demoting, suspending, and otherwise limiting Molitor's travel during work hours, all of which constitute terms and conditions of Molitor's employment.

The City's decision to, for the first time in a decade, appeal the decision of the Board, is also materially adverse. Despite the hearing evidence compelling the Board to reverse the disciplinary of Molitor in light of the City's treatment of what the Board found to be similarly situated patrol captains, the City nevertheless initiated additional litigation, which resulted in additional fees, costs, delay, and emotional strain on Molitor. Construing reasonable inferences in Molitor's favor, each of these actions might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019).

### 3. The District Court Erroneously Resolved Facts and Inferences Against Molitor to Find that Relevant Decisionmakers Lacked Knowledge of His Protected Activity

Coats confirmed, "you know, everybody in the department, no matter how much you try to keep the information, you know, within a certain few people's office, it's going to spread because people talk. The department knew what was going on." ROA.1380. Coats reiterated, "internally people talk. You know, watercooler talk occurs." ROA.1384. Rion confirmed the same sentiment: "I mean,

in HR they don't think you'd find out everything, but eventually everything trickles into my office." ROA.1296.

The former Chief and longtime HR director's confirmation that information readily spreads throughout Sulphur PD could lead any rational factfinder to discredit Wall's testimony that he had "no knowledge" of Smith's lawsuit or Molitor's support thereof at any relevant time. An inference in Molitor's favor is especially reasonable in light of Wall's testimony, which itself reflects the degree to which the Sulphur PD officers "know" of personnel matters. In metering out discipline to Molitor in 2022, Wall testified that his decision to treat Molitor differently than the other patrol captains was because of Molitor's purported previous discipline for "excessively parking up" back in 2019. The fact that Wall even knew of Molitor's 2019 conduct warrants denial of summary judgment. As of October 2019, Wall was a "captain in narcotics or detectives and had ***nothing*** to do with [Molitor's] case." ROA.1310. Not only that, but Wall, in his capacity as a captain, was not involved in Molitor's 2019 investigation in any capacity." ROA.1310.

The time at which Wall became aware of Molitor's 2019 conduct is not established in the record, which renders it a question of fact to be determined at trial. The record confirms, however, that Wall had knowledge of Molitor's 2019 conduct *before* issuing him discipline on December 28, 2022. To the extent Wall

learned of Molitor's 2019 conduct back in 2019, the timing reflects the free flow of information throughout Sulphur PD, and it is a fact from which a reasonable factfinder could readily infer Department-wide knowledge of Molitor's ADA opposition and Smith's ADA lawsuit. If, conversely, Wall learned of Molitor's 2019 conduct through Wall's conversations with Coats or upon his transition to the Chief role in September 2022, this timing reflects the high degree of knowledge reasonably attributable to an individual acting as the Chief of Sulphur PD. Either way, it strains credulity for the City to assert that the Chief of its Police Department, the highest-ranking official, was unaware of active litigation against it and/or unaware of those current officers who were likely to be called as witnesses for the same.[17] Smith's counsel had issued several Notices of Deposition to the City on December 1, 2022, formally setting depositions of Rion, Fortenberry, and Guillotte, all of whom are current Sulphur PD employees. Given the free exchange of information to which both Rion and Coats testified, and given that any reasonable factfinder could determine that Wall, as Chief, was notified that Fortenberry and/or Guillotte would have to miss work for purposes of attending a deposition, any contention that Wall had "no knowledge" of the *Smith* litigation lacks credence.

---

[17] Coats "would've learned" about Smith's lawsuit when served with it. ROA.1402.

Irrespective of the timing and extent of Wall's knowledge, the district court ignored the fact that Danahay also signed off on Molitor's December 28, 2022 discipline. Given that Danahay is who executed the Waiver of the Service of Summons on the City's behalf in the *Smith* litigation, there is no dispute that Danahay had actual knowledge of Smith's lawsuit as of February 2022. Not only did Danahay, as the Appointing Authority, have the power to override Wall in his recommended discipline of Molitor (which he did not exercise), but Danahay and Wall met specifically to discuss Molitor, a conversation which any reasonable factfinder could infer included discussion of Molitor's engagement in the protected activity at issue. The district court erred to the extent it ignored this evidence and found, beyond dispute, that the City decision-making team was "unaware" of Molitor's protected activity.

Even if a factfinder determines that Wall did not know of the *Smith* litigation until after assessing the initial discipline against Molitor on December 28, 2022, there is no dispute that Wall learned of the *Smith* litigation *before* the final alleged "adverse action" alleged by Molitor: the decision to appeal the Board to the 14th JDC. In the days leading up to Molitor's civil service appeal and Sean Smith's deposition in the *Smith* litigation, **Wall, Danahay, and Rion** learned that the City's insurer could force settlement of the *Smith* case. ROA.1553. The fact that Wall was copied on the email discussing forced settlement of *Smith* establishes that Wall had

knowledge of the *Smith* litigation, as well as its impending settlement, at that time. The district court ignored the final alleged "adverse action"–the City's decision to, for the first time in over a decade, appeal the civil service board's ruling to the 14th JDC in an effort to re-instate its proposed, severe discipline of Molitor—a decision made at the time every single purported decisionmaker/contributor, including Wall, had unequivocal knowledge of the Smith litigation.

Construing facts and inferences in Molitor's favor, the City's decisionmakers each had knowledge of Molitor's direct involvement in and contribution to the *Smith* litigation, at the latest, on August 31, 2022. Accordingly, the individuals who engaged in or otherwise contributed to the adverse actions—Danahay, Rion, and Wall—each had knowledge of the *Smith* litigation, as well as Molitor's relevance thereto, at all relevant times. The district court erred to the extent it found otherwise.

### 4. A Causal Connection Exists

Additionally, Wall, the individual who initiated or otherwise influenced each of the adverse actions set forth *supra*, did not obtain authority to discipline Molitor *until* he became Chief in September 2022. ROA.1222-23, 1305, 1402. Thus, while Molitor's last form of protected activity occurred on August 31, 2022—i.e., his production of the recording in support of Smith's lawsuit—Wall was not in the position to retaliate against Molitor until September 24, 2022.

30

Under the "first opportunity to retaliate doctrine," any delay in retaliatory activity between August 31, 2022 and September 24, 2022 cannot be used to suggest a break in the causal chain. *See, e.g., Alamo v. Bliss,* 864 F.3d 541, 556 (7th Cir. 2017); *Dixon v. Gonzales,* 481 F.3d 324, 334-35 (6th Cir. 2007). Not only that, but City officials admit that Molitor is a "phenomenal officer" who exhibited no performance issues in the past several years. ROA.1228, 1289, 1291, 1301-02, 1363, 1375-76, 1387-88, 1409. The opportunity to retaliate did not arise for Wall until he issued the notoriously vague instruction to "patrol more" on October 19, 2022.

Within less than three weeks after his now-admittedly deficient instruction to "patrol more," Wall took the "initiative"[18] to review Molitor's GPS logs and instructed Fortenberry to investigate him. Less than one week later, and despite now being armed with knowledge that at least one other captain (and, thus, half of the captains present at the October 19, 2022 meeting) had also engaged in "very excessive" parking up, Wall launched an IA investigation into only Molitor.

After learning that three of the four patrol captains had engaged in "very excessive" parking up, Wall issued the other captains informal Counseling sheets to informally clarify the expectation with respect to "parking up." In contrast, Wall issued Molitor a host of formal disciplinary actions, several of which directly

---

[18] ROA.1126, 1257, 1386.

impacted his pay and supervisory status. Even further, Wall admitted to pulling an IA investigation on Molitor *from 2019*—which, per Rion, the City *dismissed* due to the City counsel's overt discriminatory statements regarding Molitor's polyamorous relationship and which, per Rion, Wall had *no* involvement in whatsoever—to justify his recommended disciplinary actions. Then, by his own admission, Wall lied to Danahay in suggesting that Molitor had engaged in "excessive parking up" at the *Crocker Street* address in 2022,[19] which is what led Danahay to accept the proposed disciplinary action in its entirety.

Moreover, within mere days of learning that *Smith* was being settled (in part due to the damning recording provided by Molitor confirming the City's ADA-violative demands), the City—through the collective conversations of Wall, Rion, and Danahay—decided, for the first time in a decade, to appeal the Board's decision to the 14th JDC. ROA.1323-24. In so doing, the City sought to re-instate Molitor's disciplinary actions, as opposed to permitting Molitor to continue his employment at the non-punitive terms dictated by the Board.[20]

Contrary to the City's assertion that there was "nothing discriminatory" about the City's "once-in-a-lifetime decision" to appeal the Board's reversal of

---

[19] ROA.1120-21, 1240, 1355.

[20] The 14th JDC's reversal the Board is of little relevance here, given that: 1) the appellate process contemplated by the civil service statutes encompasses a different legal analysis and 2) Molitor appealed the 14th JDC ruling, which is pending before the Louisiana Supreme Court.

disciplinary action,[21] the temporal proximity is sufficiently close to link these adverse actions to Molitor's protected activity and, even moreso, to the monetary "pain" the City felt as a result thereof by having to settle *Smith* on January 31, 2023 and pay for the same out-of-pocket. Within mere *days* of learning that the insurance company was forcing the City to settle *Smith,* Wall, Rion, and Danahay had collectively decided to appeal the Board's reversal of Molitor's—a key contributor to Smith's litigation—discipline for the first time in well over a decade. This attempt to re-urge such significant discipline, especially in light of the evidence *infra* establishing the exceptional vagueness and ambiguity of the verbal directive relied upon by Wall in assessing the same, suggests retaliatory motive. Further, Wall's favorable disciplinary treatment of similarly situated captains—all who were present for the October 19, 2022 meeting and who were thereafter found to have engaged in "very excessive" parking up—is another viable indicator of causation and retaliatory motive  in this case. The district court erred to the extent it found otherwise.

### B. The City's Proffered Rationale Is Indicative of Pretext

The City produced evidence to show a facially legitimate reason for recommending some disciplining Molitor—the Board confirmed as much during the hearing. ROA.1148-49. Because the City carried its minimum burden of

---

[21] ROA.135.

production, the analysis turns to whether Molitor can prove his claim according to principles of "but for" causation and carry his burden of showing the City's proffered non-discriminatory reason is pretextual. Molitor can establish pretext "by showing that a discriminatory motive more likely motivated h[is] employer's decision." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020). Courts consider "numerous factors, including the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Id.*

### 1. The District Court Ignored Evidence that Molitor Did Not "Shirk Duties"

The City's policy manual defines "shirking duties"–the purported basis of Molitor's discipline–as "malingering, feigning illness, or attempting to shirk duties." ROA.1104. During the civil service hearing, the City admitted that, as it is defined by the policy book, Molitor was not "shirking duties" at all.

Gully testified that his investigation revealed Molitor to be "malingering," at which time he directed undersigned's attention to the Sulphur Police policy manual. After Gully self-defined "malingering" as "taking your time, just being kind of lackadaisical about responding," ROA.1104, undersigned provided the actual definition of "malingering" to the civil service board: to "exaggerate or feign illness in order to escape duty or work." ROA.1104-05. After acknowledging

his objectively incorrect understanding of "malingering" was objectively incorrect, Gully confirmed that Molitor had not been "malingering" and, thus, did not "shirk duties" as defined by policy. ROA.1105.

The Board reversed the City upon Gully's admission that Molitor did *not* "shirk duties"—the offense with which he was charged. Molitor did not "malinger" or "feign illness," nor did he ever attempt to do either of those things, such that, per the terms of the City's own policy manual, Molitor did not "shirk duties." The Board determined, just as any other rational factfinder could, that Molitor had not violated the rules pertaining to shirking duties and reversed the resulting suspension and demotion. The district court erred to the extent it ignored this evidence.

> **2. The District Court Ignored Evidence and Resolved Fact Disputes and Inferences Against Molitor to Find that Wall's October 19, 2022 was Not "Vague"**

Though the district court's Memorandum suggests that Molitor made a "vagueness argument" as to the definition of "shirking up,"[22] Molitor's Memorandum in Opposition reflects Molitor's argument that Wall's October 19, 2022 to "*patrol more*" is what was unduly vague. The district court misstated Molitor's argument, and it then disregarded probative evidence, and otherwise

---

[22] ROA.1621.

made factual findings *against* Molitor, to "reject" Molitor's reliance on the vagueness of Wall's October 19, 2022 directive as substantial evidence of pretext.

First, the district court ignored Molitor's evidence that, on October 19, 2022 Wall verbally instructed his captains and sergeants that the "time for parking up is over" and that supervisors needed to "patrol more." Wall admittedly did ***not*** provide any clarification as to how much parking up was "too much," or "excessive," nor did he clarify how much "more" patrolling was required to comply with his request. Additionally, there was no policy that indicated what constituted "too much" parking up. ROA.1235-36.

During the civil service hearing, not a single one of the six witnesses, including Fortenberry or Wall, could identify how much parking up was "too much," or "excessive," or how much "more" patrolling was required to comply with Wall's directive. ROA.1108-09, 1119-20. Moreover, the record establishes that duties of a patrol captain encompass non-patrol, administrative work,[23] and because "the duties of a captain [] change on a daily basis,"[24] there is "no number" or hours per shift a captain must patrol in order to conform his or her conduct to Wall's directive. ROA.1108-09. Even if a captain's GPS monitor reflects him as "parked up," he could be sitting in his unit performing legitimate captain job duties. ROA.1108-09. Wall himself acknowledged that the time it takes captains to

---

[23] ROA.1108-09,1235, 1259, 1296.
[24] ROA.1108-09.

perform paperwork or supervisory work "varies on the type of reports that you get . . . so times can vary."[25] In other words, "***there's no set guideline on how much time to patrol and how much time to sit up. Too many varying factors in that***." ROA.1133-34. Against this evidence, the district court's "abundantly clear" fact finding that "'parking up' for 9 or 9.5 hours in a 12-hour shift is none other than shirking one's duties'"[26] constitutes reversible error.

Wall and Fortenberry each opined on what they believed to constitute a sufficient amount of park up hours during the civil service hearing; however, they both admitted that, prior to issuing Molitor discipline, ***neither one of them ever discussed this guidepost or suggestion with Molitor***. ROA.1120-21, 1140. The *first* time Fortenberry provided any of captains clarifying instruction—i.e., "don't spend more than 2 or 3 hours in one spot"—was in connection with the Counseling Statements issued *between November 29, 2022 and December 2, 2022*. ROA.1259-60. As ignored by the district court, the fact that all four patrol captains received some form of discipline for "violating" Wall's October 19, 2022 directive is, itself, probative evidence of just how vague Wall's directive was.

In contrast to the other three captains, Wall did *not* issue Molitor a Counseling Statement, nor did Fortenberry have a conversation with Molitor regarding Wall's October 2019 directive. ROA.1071. The district court's factual

---

[25] ROA.1122.
[26] ROA.1622.

assertion that Molitor received a "Counseling Statement" and was given additional instruction between November 29, 2022 and December 2, 2022[27] is inaccurate in light of record evidence to the contrary. Not only that, but Molitor was disciplined for his patrol activities *pre-dating* November 29, 2022, so any subsequent, clarifying instruction is irrelevant to the knowledge Molitor and the other patrol captains had at the time of Fortenberry's investigation.

Moreover, after he "learn[ed] something in that civil service hearing,"[28] Wall disseminated a Memorandum dated February 6, 2023, providing significant clarification as to his expectations regarding "Patrol Supervisor Activities." ROA.1241. Wall admitted that this Memorandum this was an attempt to try and provide more clarity on what his previous directive was in the supervisor meeting where he stated, "the days of sitting up are over." ROA.1241. Thus, by issuing this Memorandum, Wall acknowledged the inherent problems with his October 19, 2022 directive.

The district court disregarded this evidence, including the fact that the Board (i.e., a factfinder presented with the same evidence) determined the directive was too vague to justify the severe sanctions the City had imposed against Molitor. Instead, the district court resolved facts and inferences against Molitor, impermissibly relied on Molitor's experience with Sulphur PD, and wrongfully

---

[27] ROA.1613.
[28] ROA.1241.

imputed knowledge to him of all policies, which is not in any record evidence, to "reject" Molitor's contention that Wall's October 19, 2022 was problematically vague. It was violation of *this* directive that gave rise to the City's discipline of all four patrol captains, and the credence of the City's reliance on *this* directive to mete out far more egregious discipline to Molitor than to the other patrol captains is of paramount importance to this case. The fact that a reasonable factfinder— here, the Board—unanimously found the directive to be vague should have resulted in a denial of summary judgment.

Construing facts and inferences in Molitor's favor, it strains credulity for the City to impose severe sanctions–an unpaid suspension, loss of seniority, and a demotion–when the record establishes that *none* of the captains had a clear understanding of Walls' expectations following his ambiguous patrolling comment in October 2019. It strains even further credulity for the City to appeal the Board's reversal of Molitor's disparate discipline in late February 2023,after learning and acknowledging the basis of Molitor's discipline for "parking up" was substantially lacking in substance. The City's continued reliance on this admittedly vague directive is probative evidence of pretext, and the district court erred to the extent to it resolved facts and inferences to hold otherwise.

### 3. The District Court Inappropriately Applied this Court's "Comparator" Standard and Erroneously Disregarded the City's Disparate Treatment of Molitor's Fellow Patrol Captains As Probative Retaliation Evidence

The predominant issue on appeal is the district court's finding that Molitor could not rely upon the City's disparate treatment of the other three patrol captains as circumstantial evidence of retaliation. ROA.1622. This disparate treatment/comparator analysis is relevant to both Molitor's ADA and First Amendment claims, and to the extent the district court's finding is erroneous, wholesale reversal is warranted.

This Court has made clear that "disparate treatment of similarly situated employees is one way to demonstrate unlawful discrimination and retaliation" and is relevant at both the *prima facie* and pretext stage. *Bryant v. Compass Group USA, Inc.,* 413 F.3d 471, 478 (5th Cir. 2005).

Molitor argued to the Board, the 14th JDC, and to the district court that the City subjected him to disparate disciplinary treatment compared to other similarly situated captains outside of his protected class. In determining whether employees are similarly situated, this Court has emphasized that employees do ***not*** need to be in "identical" circumstances—only "nearly identical." *Shahrashoob v. Texas A&M University,* 125 F.4th 641, 651 (5th Cir. 2025); *Lee v. Kan. City S. Ry. Co.,* 574 F.3d 253, 259 (5th Cir. 2009)). Molitor can show nearly identical circumstances when two employees "held the same job or responsibilities, shared the same supervisor

or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* That being said, "the question of whether individuals are similarly situated is a question of fact for the jury to decide," and a court may only grant summary judgment where "it is clear that no reasonable juror could find that the similarly situated requirement has been met." *D.S. v. East Porter County School Corp.,* 799 F.3d 793, 799-800 (7th Cir. 2015); *Forte v. Liquidnet Holdings, Inc.,* 675 Fed. Appx. 21, 25 (2d Cir. 2017).

Here, Wall conducted a supervisor meeting on October 19, 2022, wherein he instructed Molitor and the three other patrol captains—all of which were, like Molitor, now under Wall's supervision—"the time of sitting up is over. It's time to hit the neighborhoods and patrol more." ROA.1099, 1122. Molitor and the three other patrol captains 1) held the same job title and job responsibilities; 2) reported to the same supervisors (Fortenberry and, in turn, Wall); and 3) performed work out of the same location (i.e., the Sulphur Police Department). There is likewise no dispute that each of the patrol captains, Molitor included, were later found by Fortenberry and/or Wall to have "violated" the exact same "work rule," i.e., Wall's October 19, 2022 verbal "patrol more" directive. ROA.1260, 1308, 1516-18.[29] This is corroborated by Wall's admission that he metered discipline to each of the patrol captains for their respective violations, which, in turn, establishes that these

---

[29] Captain A was Jordan and Captain B was Virgadamo. ROA.1270.

individuals had their employment status determined by the same person—Wall. ROA.1516-18.

It is at this juncture that Molitor submits the initial discrimination/retaliation occurred: Wall issued Molitor more severe discipline than his fellow patrol captains under nearly identical circumstances. Because these individuals' job titles, job duties, supervisors, and deciding-officials are identical, the comparator analysis in this case turns on whether Molitor and his fellow patrol captains committed comparably serious" violations and held "essentially comparable violation histories." *See Turner v. Kan. City S. Ry. Co.,* 675 F.3d 887, 896 (5th Cir. 2012)  At a minimum, material fact disputes exist in this regard; however, upon resolving said disputes and reasonable inferences in Molitor's favor, summary judgment must be denied.

**4. Whether Molitor's "Violation" of Wall's "Patrol More" Directive was of "Comparable Seriousness" to the Other Three Patrol Captains' is a Question of Disputed Material Fact; Resolution of the Dispute in Molitor's Favor Indicates that the Patrol Captains are Proper Comparators**

This Court's precedent is clear: "nearly identical" is **<u>not</u>** "synonymous with 'identical.'" *Turner,* 675 F.3d at 983. "For example ... [e]ach employee's track record at the company need not comprise the identical number of identical infractions;" rather, these "records must be comparable." *Lee*, 574 F.3d at 260–61.

The evidence before the City at the time Wall metered discipline to the patrol captains reflects that Fortenberry identified three of the four captains—Molitor, Virgadamo, and Welch—as having "very excessive" idling times. ROA.1111-18. Though Fortenberry may have omitted the exact number of "park up" hours of Virgadamo and Welch from their respective, informal disciplinary action forms, Fortenberry explicitly noted that both Virgadamo and Welch "at times regularly park[ed] his unit up to an hour to several hours at a time while on duty." ROA.1111-18. Fortenberry's confirmation that Virgadamo had "very excessive" idling times, as well as his finding that both Virgadamo and Welch at times regularly parked their units for up to several hours at a time, indicates that Molitor's conduct—i.e., alleged "excessive" park up time for "several hours" at a time—was not "so" different as to warrant different disciplinary treatment here.

Molitor was disciplined because he was "sitting up for excessive amount of time while on Patrol." ROA.1226. Fortenberry's finding that Molitor parked up "excessively" is, for purposes of the City's Motion, no different than Fortenberry's finding that Virgadamo had "very excessive" idling times, or that Virgadamo and Welch parked "up to an hour to several hours at a time while on duty." This Court requires "an employee who proffers a fellow employee as a comparator [to] demonstrate that the employment actions at issue were taken under nearly identical circumstances." *Turner,* 675 F.3d at 895. And, the Court "must keep in mind that [it

is] reviewing [the City]'s motion for summary judgment, and thus, [it] 'must view all the facts in the light most favorable to' [Molitor]; and [the City] is required to 'show [] that there is no genuine dispute as to any material fact." *Id.*

Construing facts in Molitor's favor, the other patrol captains found to have "excessively" parked up in "violation" of Wall's October 19, 2022 "patrol more" order are proper comparators, and Wall's far more severe (i.e., disparate) discipline of Molitor is probative evidence of discriminatory/retaliatory motive. The district court erred to the extent it disregarded the City's disparate disciplinary treatment of the other patrol captains as probative evidence of causation/pretext, and its decision must be reversed accordingly.

### 5. Construing Facts and Inferences in Molitor's Favor, Despite Three of the Patrol Captains Being Found to Have Parked Up "Excessively," the City Only Issued Formal Disciplinary Action to Molitor

While the City produced evidence to support disciplining Molitor in *some* fashion, the Board found—as any reasonable factfinder could—that the City failed to meet its burden to show that its punishment of Molitor was commensurate with the infraction alleged in light of all relevant circumstances. The Board found: 1) all four captains were given the same vague directive, by the same individual, to patrol "more" on October 19, 2022; 2) all four captains were found by Fortenberry to have violated the directive; 3) of the four captains, three of them continued, in Fortenberry's words, "very excessively" parking up, leaving their vehicles in idle

for several hours at a time; and 4) while Wall informally counseled the other three captains, Wall thoroughly investigated, demoted, and suspended Molitor for engaging in the exact same behavior as at least two of the other captains post-October 19, 2022. The striking difference in treatment for identical "infractions" establishes the arbitrary and capricious decision-making at issue, which gave the Board good faith and legal cause to overturn the egregiously, disproportionate discipline the City issued to Molitor. A jury could just as easily find this evidence substantial evidence of pretext.

### 6. The District Court Erroneously Disregarded Evidence Surrounding Molitor's 2019 "Discipline"

In rejecting the other patrol captains as comparators, the district court "f[ound] that it was proper for Chief Wall to consider [Molitor]'s prior 2019 infractions that was the exact same conduct that is the subject of this lawsuit." ROA.1622.

First, Molitor *did not* actually receive any discipline in 2019. ROA.1304, 1352. While the City contemplated disciplining Molitor in 2019, the overtly discriminatory actions undertaken by the City's attorney led the City to forego disciplining Molitor at all. For comparator purposes, contrary to Wall's assertion, Molitor did *not* have any previous "disciplinary" action in his file based on 2019 conduct.

Even assuming that Molitor had been disciplined in 2019, during Molitor's civil service appeal hearing, it came to light that another one of the patrol captains—Jordan—had been counseled or otherwise "disciplined" for "excessive" parking up back in 2019. ROA.1070. In light of Jordan's hearing testimony, Molitor's counsel asked Wall whether he "weigh[ed] the fact that another captain had been disciplined in 2019" when deciding to issue far more severe discipline to Molitor. ROA.1131-32. In response, City counsel indicated that Wall "wasn't aware" of any of the other three captains' disciplinary history, so he necessarily did not take it into consideration. ROA.1131-32.

As impermissibly disregarded by the district court, Wall's failure and/or refusal to consider each of the patrol captains on equal footing is problematic for the City and is substantial evidence of Wall's illicit motive. When metering out discipline for all four of the patrol captains in 2022, Wall only considered the former "disciplinary history" of one Captain—Molitor—before subjecting him to far more excessive, formal punishment. Had Wall acted "legitimately" to determine whether the punishment he suggested for Molitor was commensurate to Molitor's "excessive" parking up, in light of all circumstances including previous discipline, Wall necessarily would have looked at the disciplinary histories of all four captains, in conjunction with their 2022 "parking up," in order to determine whether the disciplinary action could be justified. Wall did not do so.

Had Wall equally reviewed each of the four captain's "disciplinary" histories, he would have seen that at least one of the other captains, Jordan had received discipline for "excessive" parking up back in 2019. ROA.401-02. Thus, had Wall acted in a non-capricious manner, he would have no rational basis upon which to informally counsel one captain while demoting and suspending another, Molitor, when they engaged in the same infraction and have similar disciplinary histories. Construing facts and inferences in Molitor's favor, a reasonable factfinder could determine that Wall's decision to 1) consider 2019 conduct for Molitor, but not even bother to determine the previous conduct of other patrol captains; and 2) issue far more aggressive discipline to Molitor on the basis of this conduct is highly indicative of pretext. The district court erred to the extent it found otherwise.

Molitor's *prima facie* case includes evidence of close temporal proximity between Molitor's final act of participation activity on August 31, 2022 and the adverse actions alleged, as well as *exceptionally* close temporal proximity between the City's forced "agreement" to settle the *Smith* case on January 31, 2023 and, for the first time in a decade, appeal the Board's disciplinary decision in an effort to uphold a serious of disciplinary actions taken against Molitor. This *prima facie* evidence, when combined with evidence of Wall's inexplicably disparate treatment of similarly situated captains under nearly identical circumstances, raises a triable

question as to whether Molitor's contribution to the *Smith* case unlawfully motivated Wall, Danahay, and/or Rion as they met and decided to take the myriad of acts against Molitor giving rise to this lawsuit. The City is not entitled to summary judgment on this claim, and the district court must be reversed.

## II. The District Court Erroneously Dismissed Molitor's First Amendment Retaliation Claims

To prove a claim of First Amendment retaliation, Molitor must establish that "(1) [he] suffered an 'adverse employment decision'; (2) [his] speech involved 'a matter of public concern'; (3) [his] 'interest in commenting on matters of public concern ... outweighs the [d]efendant's interest in promoting efficiency'; and (4) [his] speech motivated the adverse employment decision." *Haverda v. Hays County,* 723 F.3d 586, 592 (5th Cir. 2013). Once Molitor has met his burden, the City may avoid liability by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action even in the absence of Molitor's protected speech. *Haverda,* 723 F.3d at 592 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Molitor can refute that showing by presenting evidence that "[the City's] ostensible explanation for the [adverse action] is merely pretextual." *Haverda,* 723 F.3d at 592.

As noted *supra*, it is undisputed that Molitor was suspended without pay, demoted, and prohibited from traveling to Crocker Street. These actions satisfy the

"adverse employment action" prong of Molitor's *prima facie* case. For the reasons that follow, the district court erred in its analysis of the remaining analytical prongs.

### A. The District Court Erroneously Disregarded the Broad Definition Afforded to a Matter of "Public Concern" to Find that Speech and/or Expression Regarding Polyamorous Relationships Does Not Qualify for First Amendment Protections

City witnesses, including Wall,[30] confirmed that Molitor openly discussed and expressed his involvement in a polyamorous relationship. ROA.1294-95, 1355, 1389-90, 1420-21. Molitor's involvement in a polyamorous relationship became "common knowledge within the PD" as of 2019, ROA.1355, approximately three years prior to certain "sitting up" allegations made by Wall in November 2022. Resolving facts Molitor's favor, Molitor openly discussed his belief that a polyamorous relationship is a valid construct.

In granting summary judgment to the City, however, the district court rejected Molitor's argument that one's open support of a polyamorous relationship is a matter of public concern, and, in turn, that Molitor's "speech regarding the validity of polyamory as a relationship construct," nor "his behavior in furtherance of that belief" warrants First Amendment protection. ROA.1624. The district court's ruling is erroneous.

---

[30] ROA.1240.

The Supreme Court has explained that "[s]peech involves matters of public concern when it can be fairly considered as relating to ***any matter of political, social, or other concern to the community or when it is … a subject of general interest and of value and concern to the public.*** *Gibson v. Kilpatrick,* 838 F.3d 476, 482 (5th Cir. 2016) (quoting *Lane v. Franks*, —— U.S. ——, 134 S.Ct. 2369, 2380, 189 L.Ed.2d 312 (2014)) (emphasis added). The public-concern inquiry centers on whether "the public or the community is likely to be truly concerned with or interested in the particular expression." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004)

That being said, *Connick* recognized that some issues are "inherently public concern," citing "racial discrimination" as one example. *Id.* at 148, n.8, 103 S.Ct. at 1691, n. 8. It is impossible not to note that a similar public debate is currently ongoing regarding the rights of individuals who voice their support of, or who otherwise openly engage in, non-monogamous or other non-traditional relationships. *See, e.g., Obergefell v. Hodges*, 576 U.S. 644, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015); *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 631, 138 S.Ct. 1719, 201 L.Ed.2d 35 (2018). As noted by the *Obergefell* dissent, "much of the majority's reasoning [in *Obergefell*] would apply with equal force to the claim of a fundamental right to plural marriage," leading the Court to directly address the existence of, and potential implications surrounding,

polyamorous relationships. *Id.* at 704-05.[31] Hot button political and social issues surrounding "nontraditional" relationship constructs such as polyamory readily fit the broad definition of "any matter of political, social, or other concern to the community" identified in *Lane* and *Connick*. *See also, e.g., Williams v. Fontanez*, 2023 WL 3819296 (D. Md. June 5, 2023)(assuming that speech relating to polyamory/queerness could be protected by the First Amendment but dismissing the claim upon the failure of the plaintiff to provide causation evidence). The fact of Molitor's belief and public support[32] in polyamory, once spoken or otherwise communicated, necessarily and ineluctably involved him in that discussion. Speech that "touches upon" this explosive issue is no less deserving of constitutional attention than speech relating to more widely condemned forms of discrimination.

Additionally, the open performance of polyamory can be seen as an expressive performance of association as outlined in *Roberts v. U.S. Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). It is implicit in many arguments for same-sex marriage equality that people have an important interest in being open and honest about their personal lives. Being an "out'" gay man or women

---

[31] Polyamory has been described as "intimacy with more than one person with the consent and knowledge of all parties." Note, Three's Company, Too: The Emergence of Polyamorous Partnership Ordinances, 135 Harv. L. Rev. 1441, 1444 (2022) (citing Neel Burton, Polyamory: A New Way of Loving?, Psych. Today (Mar. 19, 2020), https://www.psychologytoday.com/us/blog/hide-and-seek/201704/polyamory-new-way-loving [https://perma.cc/25NU-W23Z)).

[32] "Communications visible to the public are more likely to concern the public." *Lumpkin v. Aransas Cty., Tex.,* 712 Fed.Appx. 350, 357 (5th Cir. 2017).

holds a myriad of positive psychological benefits and is a performative, public statement about the essential legitimacy of gay relationships. This performative quality of nonnormative relationships like polyamory likewise operates as the sort of freedom that same-sex relationships seek. Not only that, but there are protections against discrimination toward unmarried couples generally,  and these two considerations militate toward an acceptance of polyamorous families as families to be protected from undue government interference, because marriage, adoption, or blood relationships do not apply.

A person engages in protected speech when they state their sexual orientation. *See Cook v. Gates*, 528 F.3d 42, 62 (1st Cir. 2008) (citation omitted) Accordingly, Molitor posits that his speech regarding the validity of polyamory as a relationship construct, and his behavior in furtherance of that belief, warrants the same First Amendment protection. The City, though it argued to the contrary, did not provide a single case or statute in support of its position. The district court erred to the extent it resolved all facts and inferences against Molitor, completely disregarded the case law in support of Molitor's position and, instead, blindly adopted the unsupported legal conclusion drawn by the City's attorney. The district court must be reversed to the extent it improperly held otherwise.

**B. The District Court Disregarded Evidence that Wall Took Adverse Action Against Molitor Based on His Public Statements In Support of And/or Engagement in a Polyamorous Relationship**

The district court stated, "[t]o be certain, this case has nothing to do with where [Molitor] parked, who he was seeing, or if he had a girlfriend and a wife, but the amount of undisputed time he was parked instead of patrolling the streets of Sulphur or responding to calls." ROA.1624-25. In making this conclusory statement, the district court resolved a series of disputed facts and inferences *against* Molitor in direct contravention of established summary judgment procedure.

The City argued, and the district court adopted, that "what [Molitor] did with respect to 'sitting up' at his 'friend's' residence, and excessively 'sitting up' at other locations is what resulted in the [2022] discipline of which he complains." ROA.138. To the extent Molitor's speech/expression regarding polyamory is otherwise protected, the City attempted to cast Molitor's protected speech/conduct as "disruptive" to the workplace in order to divest the speech/conduct of its protected status.

In ruling against Molitor, the district court impermissibly ignored two pieces of record evidence that are probative evidence of Walls' illicit reliance on Molitor's protected speech/expression when disciplining him in December 2022.

### 1. Construing Evidence in the Light Most Favorable to Molitor, Wall Admitted that Molitor was *Not* Excessively Parking Up at Crocker Street in 2022

As noted *supra*, Crocker Street had been determined, *as of 2019*, to belong to Molitor's then-girlfriend, Delia. ROA.1294-95, 1376-77. Again, Molitor was *not* disciplined for his 2019 conduct 2019, and Wall, who was a captain in another division at the time, had nothing to do with Molitor. ROA.1235.[33]

To justify his decision to disparately discipline Molitor *in December 2022*, Wall stated "in 2019 Molitor was doing the same thing [i.e., parking up] *at a different location* than what he was doing in 2022." ROA.1230, 1235. Wall's testimony confirms that the purported "cause of concern" for Wall in 2022 was *not* South Crocker Street/Delia's residence–it was a "different location" that, for reasons neither Wall nor the City can explain, Wall did not include in his "prohibition" when metering discipline to Molitor in December 2022.

Wall confirmed that that the time Molitor appeared at Crocker Street in 2022 "wasn't excessive." ROA.1239-40. Thus, Wall included Crocker Street in the 2022 discipline *despite* admitting that Crocker Street was not the site of excessiveness in 2022. ROA.1239-40. The City's reliance on evidence from 2019 to justify an unrelated incident of alleged "parking up," at an entirely different

---

[33] Wall pulled Molitor's 2019 IA documents in the middle of deciding what discipline to issue. ROA.1235.

address unrelated to Molitor's polyamorous relationship, in an entirely different timeframe, is indicative of pretext. ROA.139.

**2. Construing Evidence in the Light Most Favorable to Molitor, The City's Records Reflected Him "Parking Up" Excessively at Victory Worship Center, *Not* Crocker Street**

As erroneously disregarded by the district court, Fortenberry's investigation corroborates that Crocker Street was not the issue for Molitor in 2022: Molitor's time spent there was *minimal* compared to the time Molitor spent at Victory Worship Center. ROA.1120-21. The district court impermissbly ignored record evidence reflecting that Molitor "parked up" at the ***Victory Worship Center in 2022, not South Crocker Street***. Why Wall chose to include a blanket prohibition against Molitor traveling to Crocker Street and not the Victory Worship Center, given Wall's own admission that his concerns with Molitor "parking up" had nothing to do with Crocker Street, is a question that the City cannot legitimately answer, absent Wall's unadulterated, discriminatory/retaliatory motive.

When asked to explain why he included the Crocker Street prohibition in the December 28, 2022 discipline, Wall stated that the address "was known that's where Sergeant Molitor at one point girlfriend lived. ***With him being married and visiting someone while on duty in a city unit, it's just as Chief, I felt obligated to make that decision for him not to go there.***" ROA.1126, 1132. Wall admitted that he "didn't want people looking at this married man who was part of the department

who had a girlfriend on the side," ROA.1132, and confirmed that the prohibition was, "in part," a moral decision. When asked if the South Crocker Street prohibition was a moral decision:

> if you're on duty, I don't believe the perception that you have stopping by where most people know at one point that was your girlfriend is not a picture that the police department wants. ROA.1132.

Construing this evidence in the light most favorable to Molitor, a reasonable factfinder could find that Wall's decision to meter out far more severe discipline to Molitor was motivated by Wall's disagreement with Molitor's expression/views regarding polyamorous relationships. Given record evidence that Molitor's travel to Crocker Street in 2022 was *not* the source of his excessive parking up in 2022, Wall's decision to prohibit Molitor from traveling to Crocker Street and not Victory is clear, probative evidence of discriminatory/retaliatory motive. For the district court to ignore or otherwise disregard this evidence, to such an egregious extent that it found "this case has nothing to do with where [Molitor] parked, who he was seeing, or if he had a girlfriend and a wife, but the amount of undisputed time he was parked instead of patrolling the streets of Sulphur or responding to calls,"[34] it did so in palpable error. It must be reversed accordingly.

---

[34] ROA.1624-25.

### C. The District Court Erroneously Disregarded Evidence Refuting Any Contention that the City Would Have Taken the Same Action Absent Molitor's Protected Conduct

Wall moved for more egregious disciplinary action against Molitor because Molitor had "done it once before." ROA.1260. The district court's erroneous refusal to consider Wall's disparate treatment of the other patrol captains in connection with Molitor's ADA retaliation claim is equally erroneous here. When metering out discipline for all four of the patrol captains in 2022, Wall only considered the former "disciplinary history" of one—Molitor—before subjecting him to far more excessive, formal punishment than the other captains. Had Wall equally reviewed each of the four captain's "disciplinary" histories, he would have seen that at least one of the other captains, Captain Jordan had received discipline for "excessive" parking up back in 2019. ROA.401-02. Thus, had Wall acted in a truly nondiscriminatory manner, he would have no rational basis informally counseling one captain, while simultaneously demoting and suspending another, when they engaged in the same infraction and have similar disciplinary histories.

Additionally, the record makes clear that Molitor had been made subject to the IA investigation in 2019 based explicitly on him "parking up" at the address of his girlfriend, which touches directly on his protected speech/expression. ROA.1294-95, 1376-77. There is no reason, aside from blatant, unlawful reliance on Molitor's speech/express with respect to polyamory, that Wall would have, in

December 2022 1) gone back three years in time to rely upon a disciplinary action that was rescinded on discriminatory grounds; and 2) include the South Crocker Street address prohibition—which he admits was *not* the address at issue in 2022—in his 2022 disciplinary action to Molitor. Rion acknowledged that Wall's inclusion of the prohibition on Crocker Street was a problem and that "that's not what [she] would have put." ROA.1314. To the extent Molitor spent any time at South Crocker Street in 2022—which, per Wall himself, was *not* excessive—Molitor did so within his sanctioned lunch break, which is expressly allowed. ROA.1316, 1356, 1420.

Resolving facts and inferences in Molitor's favor, Wall subjected Molitor to more significant discipline than the similarly situated captains in 2022 based solely on a purported infraction from 2019, which involved Molitor purportedly "parking up" excessively at the Crocker Street address and which lead to Molitor's views on polyamorous becoming public knowledge throughout Sulphur PD. The City has not come forth with any evidence to suggest that, absent Wall's improper reliance on Molitor's 2019 IA investigation (which, again, touched directly on his protected First Amendment status), he would have subjected Molitor to anything more than the informal Counseling Statements he issued to the other captains.

## CONCLUSION

The district court's ruling must be reversed in its entirety, and the matter must be remanded for trial.

/s/ James E. Sudduth, III
JAMES E. SUDDUTH, III

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that on October 14, 2025, this Brief was served via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov, upon all registered CM/ECF users in this appeal.

Counsel further certifies that on October 14, 2025, the foregoing motion was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov.

Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ James E. Sudduth, III
JAMES E. SUDDUTH, III

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,964 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used for the word count).

/s/ James E. Sudduth, III
JAMES E. SUDDUTH, III